# UNITED STATES DISTRICT COURT FOR THE
# WESTERN DISTRICT OF MISSOURI
# WESTERN DIVISION

| | |
|---|---|
| TRAVIS MIDGYETT, ) | |
| ) | |
| Petitioner, ) | |
| ) | |
| vs. ) | Case No. 13-0969-CV-W-GAF-P |
| ) | |
| LARRY DENNEY, ) | |
| ) | |
| Respondent. ) | |

## OPINION AND ORDER DENYING PETITION FOR HABEAS CORPUS AND DENYING THE ISSUANCE OF A CERTIFICATE OF APPEALABILITY

Petitioner, Travis Midgyett, filed this pro se habeas corpus petition pursuant to 28 U.S.C. § 2254 on September 25, 2013, seeking to challenge his 2007 convictions and sentences for first degree attempted robbery and second degree murder, which were entered in the Circuit Court of Boone County, Missouri.

The petition raises eleven grounds for relief: (1) that the trial court erred by allowing in evidence that petitioner was a drug dealer; (2) that the trial court erred by limiting the cross-examination of a witness; (3) that the trial court erred by not allowing petitioner to present the victim's wife's testimony; (4) that trial counsel was ineffective for failing to present Russell Chrisman's testimony; (5) that trial counsel was ineffective for failing to present Russell Chrisman's testimony after stating to the jury that Chrisman's testimony would be presented; (6) that trial counsel was ineffective for failing to present Angel Midgyett's testimony; (7) that trial counsel was ineffective for failing to present Darlene Midgyett's testimony; (8) that trial counsel was ineffective for failing to present Latonya Turner's testimony; (9) that trial counsel was ineffective for failing to present Demorea Salisbury's testimony; (10) that appellate counsel was

ineffective for failing to "verify exculpatory, handwritten letters sent by co-defendant Rodney Cunningham to Petitioner"; and (11) that trial counsel was ineffective for failing to "adequately cross-examine eye witness Tiesha Moody."

Respondent contends that grounds 1, 2, 3, 4, 5, 6, 7, 8, and 9 are without merit, and grounds 10 and 11 are procedurally defaulted. The court notes that grounds 1, 2, 3, and 10 are procedurally defaulted, and the remaining grounds are without merit.

## SUMMARY OF THE FACTS

On appeal from the denial of his Rule 29.15 motion, the Missouri Court of Appeals summarized the facts as follows:

> Carlos Kelly, a drug dealer, was murdered in his home during the early morning hours of March 29, 2006. On the previous evening, Kelly had been partying and doing drugs with Teisha Moody, who sold drugs with Kelly, and Angela Hawkins, Moody's cousin. At around 2:00 a.m. on March 29, as the party was winding down, Damorea Salisbury, who lived with Kelly, became hungry and asked Hawkins to take him to a nearby McDonald's. Hawkins agreed. Moody decided to go upstairs to take a shower, and Kelly was asleep on the couch in the living room. When Moody finished her shower, she went downstairs to lock the front door to Kelly's apartment, which Salisbury and Hawkins had left unlocked. Before Moody locked the door, she looked out of the blinds that covered a window in the door. She saw a pair of eyes looking back at her. Immediately, the door was pushed open, and three men barged into the apartment.
>
> The men were looking for money and drugs. They awakened Kelly and asked him where the drugs could be found. One of the men went outside and returned with a piece of wood. He hit Kelly in the head with the piece of wood, knocking Kelly unconscious. At around this time, Hawkins and Salisbury returned to the apartment; they were also questioned about the location of the drugs, and Salisbury was stabbed in the leg. The men ransacked the house, looking for drugs and money, but were not finding anything. The men tried to revive Kelly by throwing cold water on him to question him further. When Kelly did not respond, the men figured that he was dead. They

eventually left the apartment.

Moody then went upstairs to collect her things, including about $800 worth of drugs that the intruders had not found. Moody, Hawkins and Salisbury then left the apartment and called the police from a nearby gas station to notify them of Kelly's murder.

On March 30, 2006, Midgyett and Rodney Cunningham were arrested for Kelly's murder. Both men denied having anything to do with the crime. In March of 2007, Midgyett was tried for Kelly's murder and for the attempted robbery. Moody and Hawkins testified against Midgyett, both claiming that he was one of the three men who broke into Kelly's apartment and killed him. Midgyett presented the testimonies of two of his cousins, with whom he was living at the time, and of his girlfriend, all of whom stated that Midgyett was home for at least part of the night and the early morning hours during which Kelly was murdered. Midgyett also presented evidence from a Sprint engineer that his cell phone, which made or received calls throughout the relevant time period of the murder, was most likely not anywhere near Kelly's apartment. The jury was unable to agree on a verdict, and the court declared a mistrial.

Midgyett was retried in November of 2007. Midgyett was once again represented by Counsel, who planned to present the same evidence as he had at Midgyett's first trial. The State also put on much of the same evidence, with one important addition: in the intervening time period between Midgyett's first and second trials, Cunningham had been found guilty of Kelly's murder. Although Cunningham, like Midgyett, had always maintained that he had nothing to do with the murder, after his guilty verdict, he agreed to testify against Midgyett in exchange for the State's supporting Cunningham's counsel's request for a significant reduction in his sentence, which was to be imposed *after* Midgyett's second trial. Counsel knew that Cunningham would testify against Midgyett, but he believed that Cunningham's testimony would be impeachable. In his opening statement, Counsel told the jury that he would present electronic evidence from a Sprint cellular phone expert showing that Midgyett's Sprint cell phone (and thus, presumably, Midgyett) could not have been at Kelly's apartment on the night of his murder. After Cunningham's testimony, however, Counsel decided not to present the cell phone evidence. He also did not present Midgyett's girlfriend or one of Midgyett's two cousins, and he did not present Midgyett's mother. The jury found Midgyett guilty of both the

murder and the attempted robbery. Midgyett's convictions were affirmed on appeal. *State v. Midgyett*, 297 S.W.3d 932 (Mo. App. W.D. 2009).

Midgyett filed a motion for post-conviction relief on December 31, 2009. Midgyett alleged that Counsel was constitutionally ineffective in abandoning Midgyett's alibi defense in that Counsel did not call to the stand Midgyett's girlfriend, Midgyett's cousin, the Sprint engineer, and Midgyett's mother, who would have testified that Midgyett was never without his cell phone. Midgyett claimed that Counsel's failure to present this evidence was compounded by his promise to the jury, during opening statements, that this evidence would be forthcoming. Midgyett also claimed that Counsel was ineffective for failing to call witnesses Damorea Salisbury and Amy Garrison at his second trial. Finally, Midgyett claimed that Counsel ineffectively cross-examined Moody at his second trial. [f.n. 1]. The motion court denied all of Midgyett's claims.

> [f.n. 1] Midgyett made other claims of error in his Rule 29.15 motion but has abandoned those arguments on appeal, and thus, we need not and do not address those arguments in our ruling today.

Midgyett alleges three points of error on appeal. The first two, which we consider together, are that the motion court erred when it found that Counsel was not constitutionally ineffective for failing to call to the stand witness Russell Chrisman, the Sprint engineer, especially after having promised the jury during opening statement that "experts from Sprint" would testify. Midgyett's third point is that the motion court erred by failing to consider the aggregate effect of all of Counsel's alleged errors, which, if considered together, would have shown Counsel to have been constitutionally ineffective.

(Doc. No. 8, Ex. 4, pp. 2-4).

Before the state court findings may be set aside, a federal court must conclude that the state court's findings of fact lack even fair support in the record. Marshall v. Lonberger, 459 U.S. 422, 432 (1983). Credibility determinations are left for the state court to decide. Graham v. Solem, 728 F.2d 1533, 1540 (8th Cir. en banc 1984). It is petitioner's burden to establish by

clear and convincing evidence that the state court findings are erroneous. 28 U.S.C. § 2254 (e)(1).[1] Because the state court's findings of fact have fair support in the record and because petitioner has failed to establish by clear and convincing evidence that the state court findings are erroneous, the Court defers to and adopts those factual conclusions.

## **GROUNDS 1, 2, 3, &10 – PROCEDURAL DEFAULT**

In ground 1, petitioner contends that trial court erred in allowing admission of evidence that asserted he was a drug dealer. In ground 2, he contends that "the trial court limited cross-examination of co-defendant Cunningham as to his drug dealing relationships," thereby violating his Due Process rights under the Fourteenth Amendment of the U.S. Constitution. In ground 3, he contends that the trial court erred in denying him "the right to present evidence in support of a viable defense," thereby violating his Due Process rights under the Fourteenth Amendment. In ground 10, he contends that appellate counsel failed to "verify exculpatory [] handwritten letters from co-defendant Rodney Cunningham explaining that his trial testimony was not true." Grounds 1, 2, 3, and 10 are procedurally defaulted. In Coleman v. Thompson, 501 U.S. 722 (1991), the Supreme Court held:

> In all cases in which a state prisoner has defaulted his federal claims in state court pursuant to an independent and adequate procedural rule, federal habeas review of the claims is barred unless the prisoner can demonstrate cause for the default and actual prejudice as a result of the alleged violation of federal law, or demonstrate that failure to consider the claims will result in a fundamental miscarriage of justice.

Id. at 750. Cause, actual prejudice, and the probability of a "fundamental miscarriage of

---

[1] "In a proceeding instituted by an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court, a determination of a factual issue made by a State court shall be presumed to be correct. The applicant shall have the burden of rebutting the presumption of correctness by clear and convincing evidence." 28 U.S.C. § 2254(e)(1).

justice" are to be judged under criteria set out in Wainwright v. Sykes, 433 U.S. 72 (1977), and Murray v. Carrier, 477 U.S. 478 (1986). Coleman, 501 U.S. at 748-50.

A review of the record shows that petitioner did not present grounds 1, 2, or 3 in his original or amended Rule 29.15 motion. Further review of the record shows that, although petitioner presented ground 10 in his amended Rule 29.15 motion, petitioner did not raise it on appeal from the denial of that motion. Therefore, claims 1, 2, 3, and 10 are procedurally defaulted and may not be reviewed by this Court unless petitioner can demonstrate cause and actual prejudice, or that failure to consider his claims will result in a fundamental miscarriage of justice. Coleman, 501 U.S. at 750. The Court will not reach the "prejudice" component of the analysis unless it first finds that the petitioner has demonstrated "cause" for his procedural default.

Petitioner does not present any valid explanation for why grounds 1, 2, and 3 were not pursued in his original Rule 29.15 motion, or why ground 10 was not pursued on appeal from the denial of his Rule 29.15 motion. Therefore, he has failed to demonstrate cause for his procedural default. As a result, we do not consider prejudice. The Court, however, can still reach the merits of his claims if petitioner can show that he is "probably actually innocent" of the crimes for which he was convicted. Bowman v. Gammon, 85 F.3d 1339, 1346 (8th Cir. 1996), cert. denied, 520 U.S. 1128 (1997). To demonstrate his innocence, petitioner must satisfy a two-part test: First, he must support his allegations of constitutional error "with new reliable evidence. . . that was not presented at trial." Second, he must establish "that it is more likely than not that no reasonable juror would have convicted him in light of the new evidence." Id., citing Schlup v. Delo, 513 U.S. 298 (1995). Petitioner fails to make this showing.

Petitioner has failed to show cause for his default of grounds 1, 2, 3, and 10. He does not show that a manifest injustice will occur if these grounds are not reviewed on the merits, and he has failed to meet the Schlup standard for actual innocence. Id. Therefore, federal review of grounds 1, 2, 3, and 10 are barred.

Grounds 1, 2, 3, and 10 are denied.

### GROUND 4, 5, 6, 7, 8, 9, & 11
### INEFFECTIVE ASSISTANCE OF COUNSEL

In ground 4, petitioner contends that trial counsel was ineffective for failing to present Russel Chrisman's testimony. In ground 5, he contends that trial counsel was ineffective for failing to present Russel Chrisman's testimony after promising the jury that his testimony would be introduced. In ground 6, he contends that trial counsel was ineffective for failing to present Angel Midgyett's testimony. In ground 7, he contends that trial counsel was ineffective for failing to present Darlene Midgyett's testimony. In ground 8, he contends that trial counsel was ineffective for failing to present Latonya Turner's testimony. In ground 9, he contends that trial counsel was ineffective for failing to call Demorea Salisbury as a witness. In ground 11, he contends that trial counsel was ineffective for failing to "adequately cross-examine eye witness Tiesha Moody."

In order to succeed on a claim of ineffective assistance of counsel, petitioner must establish that: (1) his counsel's performance was unreasonable as viewed in the totality of the circumstances; and (2) his defense was prejudiced by counsel's action in that there is a reasonable probability that, but for counsel's unprofessional acts, the result of the proceeding would have been different. Strickland v. Washington, 466 U.S. 668, 694-95 (1984); Schaeffer v. Black, 774 F.2d 865, 867 (8th Cir. 1985). Reasonably effective assistance of counsel may be

defined as the skill and diligence that a reasonably competent attorney would exercise under similar circumstances. See, e.g., Strickland v. Washington, 466 U.S. at 687-90. Judicial scrutiny of counsel's performance must be highly deferential, id. at 689, and there is a "strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." Id.

On appeal from the denial of his Rule 29.15 motion, the Missouri Court of Appeals disposed of petitioner's claims as follows:

### Standard of Review

> We review the motion court's findings and conclusions on a Rule 29.15 motion only to determine whether they were clearly erroneous. *Johnson v. State*, 333 S.W.3d 459, 463 (Mo. banc 2011); Rule 29.15(k). "The motion court's findings and conclusions are clearly erroneous only if, after reviewing the entire record, the appellate court is left with the definite and firm impression that a mistake has been made." *Krider v. State*, 44 S.W.3d 850, 856 (Mo. App. W.D. 2001).
>
> When a motion alleges ineffective assistance of counsel, the movant "must show that counsel's performance did not conform to the degree of skill, care, and diligence of a reasonably competent attorney and that movant was thereby prejudiced." *Johnson*, 333 S.W.3d at 463, (internal quotations and citation omitted); *Strickland v. Washington*, 466 U.S. 668, 687 (1984). "To demonstrate prejudice, a movant must show that, but for counsel's poor performance, there is a reasonable probability that the outcome of the court proceeding would have been different." *Johnson*, 333 S.W.3d at 463 (internal quotations omitted). An appellate court "presumes that counsel acted professionally in making decisions and that any challenged action was part of counsel's sound trial strategy." *Id.* It is Midgyett's burden to overcome this presumption. *State v. Tokar*, 918 S.W.2d 753, 761 (Mo. banc 1996).

### Failure to Present Witness Chrisman

> Midgyett's first two points on appeal involve Counsel's failure to call the Sprint engineer, Chrisman, to the witness stand after his

opening statement included Counsel's promise that the jury would hear expert cellular phone testimony from Sprint representatives. Generally, to succeed on an ineffectiveness claim based upon counsel's failure to call a witness, the movant must show: (1) that trial counsel knew or should have known of the witness's existence; (2) that the witness could be located through reasonable investigation; (3) that the witness would testify; and (4) that the witness's testimony would have produced a viable defense. *Worthington v. State*, 166 S.W.3d 566, 577 (Mo. banc 2005). Counsel's decision not to call a witness is presumed to be a matter of trial strategy and a movant must clearly show otherwise before we will find ineffective assistance. *Hutchison v. State*, 150 S.W.3d 292, 304 (Mo. banc 2004).

Complicating matters, however, is the fact that Counsel promised the Sprint expert witness testimony in his opening statement. Counsel called this "electronic evidence" one of the "building blocks" of Midgyett's defense. When a defense attorney promises during opening statements that the attorney will present certain evidence and then does not present that evidence, the attorney opens himself up to criticism of the effectiveness—or ineffectiveness—of his representation of the defendant. *See Blankenship v. State*, 23 S.W.3d 848, 851 (Mo. App. E.D. 2000). That is not the end of the inquiry, however. Instead, when determining whether an unfulfilled evidentiary promise made by defense counsel could contribute to a finding of counsel's ineffectiveness, courts look to whether "unforeseeable events" occurring during the trial would justify counsel's change in trial strategy. *Francis v. State*, 183 S.W.3d 288, 303 (Mo. App. W.D. 2005).

At the motion hearing, Counsel testified that, although he knew that Cunningham would testify at Midgyett's second criminal trial, he did not realize until after Cunningham's testimony how credible Cunningham's testimony would be. The question, then, is whether a defense counsel's estimation of a key witness's credibility can constitute an unforeseeable event that could justify the defense counsel's change in trial strategy. Counsel testified that Cunningham came across as being "brutally honest," meaning that, in Counsel's estimation, the jury not only found Cunningham credible when he testified that he was involved in Kelly's murder, but that the jury found Cunningham to be a really bad character. [f.n. 2].

[f.n. 2] Given the jury instructions in the second trial

in which the jury was directed to find Midgyett guilty of attempted robbery in the first degree whether Midgyett personally committed the criminal conduct himself *or* if he "acted together with or aided Rodney Cunningham . . . in committing the offense" (Instruction No. 6), any connection to Cunningham on the evening of the crimes was fraught with the danger that a jury would conclude that Midgyett had aided, promoted, or otherwise furthered the commission of the crimes Cunningham was admitting to in his testimony, which, of course, would lead to Midgyett's conviction.

Counsel testified that, after Cunningham's testimony, Counsel believed it highly inadvisable to connect Midgyett to Cunningham any further, and that the cell phone evidence showed several calls between Cunningham's and Midgyett's cell phones during the time period in which Kelly's murder took place. [f.n. 3]. Not only would the Sprint engineer's testimony show calls between the two phones during the relevant time period, but also that the calls from both Cunningham's and Midgyett's phones were originating from the same cell tower, meaning that they were in fairly close proximity to one another. Counsel testified at the motion hearing that this further connection between Midgyett and Cunningham, whom Counsel felt that the jury believed to have been involved in Kelly's murder during an attempted robbery, was too risky to present to the jury, even though he had initially planned on presenting the evidence. Specifically, Counsel stated, "As I recall, it was the calls—it was some of the call traffic between those two phones and the tower evidence with respect to that traffic." Shortly thereafter, Counsel continued, "We had discussions . . . that at that time going down a road where we have a lot of calls between Cunningham and Midgyett and maybe looking at further rebuttal evidence on that stuff would have hurt us was our thought." In light of the fact that Midgyett was charged alternatively—that *either* Midgyett committed the charged offenses himself *or* Midgyett *acted together with or aided Cunningham* in committing the offenses—we conclude that Counsel's assessment of how Cunningham's testimony was received by the jury, coupled with the fact that the cell phone evidence intimately connected Cunningham to Midgyett, could fairly justify his change of trial strategy as to the presentation of the cell phone evidence.

[f.n. 3] We also note that the Sprint engineer's

testimony would not have unqualifiedly supported Midgyett's defense. *See Worthington v. State*, 166 S.W.3d 566, 577 (Mo. banc 2005) ("If a potential witness's testimony would not unqualifiedly support a defendant, the failure to call such witness does not constitute ineffective assistance." (internal quotation omitted)). Although the cell phone evidence certainly could have shown that it was highly unlikely that Midgyett's *cell phone* was not [sic] at the scene of Kelly's murder during the relevant time period, there was no testimony in either of Midgyett's two trials that placed the cell phone in Midgyett's possession during that time. Although Midgyett's mother's testimony at his first criminal trial was that Midgyett was normally reachable on his cell phone, and that Midgyett's mother had, in fact, reached him on his cell phone several times on the day preceding the murder, Midgyett's mother did not testify that she had called Midgyett in the several hours previous to or following Kelly's murder. No other witness testified that Midgyett had his cell phone in his possession at the time of Kelly's murder, and Midgyett himself did not testify (and notably, Midgyett does not complain of Counsel's strategy not to call Midgyett as a witness in his defense). Although Midgyett argues that the presence of a cell phone "permits" the reasonable inference that the cell phone owner is present with the phone, such an inference is certainly not *required*. To make this inference, even if it would otherwise be permissible, would be to make an inference contrary to the jury's verdict, which neither a motion court nor the appellate court reviewing the motion court's order may do. Likewise, as we discuss in our ruling today, the cell phone evidence connected Midgyett to Cunningham, both in the form of communication with each other at or near the time of the murder and in the same "tower location" at or near the time of the murder. If, as Counsel surmised, Cunningham was believed by the jury, these cell phone "connections" to Cunningham would have severely diminished any alibi defense by Midgyett and may have actually had the opposite effect of helping the State prove its case against

Midgyett.

Moreover, at the motion hearing, Counsel made clear that his failure to call the Sprint engineer to testify about the cell phone records was not due to any inadvertence but was, indeed, a matter of trial strategy. *See Gennetten v. State*, 96 S.W.3d 143, 151 (Mo. App. W.D. 2003) (analyzing whether counsel's failure to call a particular witness, which the court had concluded was error, was due to inadvertence or was, rather, a matter of trial strategy). Counsel testified that he knew it was a "substantial decision to let go of" the Sprint engineer's testimony. Counsel stated that he had to "make an evaluation based upon how we thought Cunningham testified and how that testimony came across and how the other evidence was hurting us; whether we wanted to go down the road, some of the things a [sic] cell phone evidence exposed us to." Counsel further testified that "it was clearly discussed in that letting it go was a big deal. And, I mean, I believe that was discussed with [Midgyett] also." Thus, Counsel's decision was clearly considered, strategic, and involved input from Counsel's client—Midgyett.

Once an attorney's action is found to have been a matter of trial strategy, the movant must overcome the presumption that the attorney's trial strategy was sound. To do this, the evidence must establish that counsel's actions "fell outside the wide range of professional competent assistance." *Borst v. State*, 337 S.W.3d 95, 102 (Mo. App. W.D. 2011) (internal quotation omitted). "Movant cannot rely on the distorting effects of hindsight, and we must deferentially review the situation from the attorney's perspective at the time of the representation." *Id.* (internal quotation omitted).

The motion court found that Cunningham's testimony "put a wrench in the entire alibi defense" and concluded that Counsel's resulting decision not to call the Sprint engineer was strategically sound and justified. Based upon Counsel's considered and reasonable strategy with regard to this witness that we have identified previously, we do not find the motion court's determination to be clearly erroneous. Accordingly, Midgyett's first two points are denied.

### Cumulative Effect of Trial Errors

Midgyett's third point on appeal is that the motion court erred by failing to consider the aggregate effect of Counsel's many claimed errors. Midgyett argues that the aggregate effect of Counsel's errors

impacted the fairness and outcome of Midgyett's second criminal trial and undermined confidence in the outcome of his second trial. In his Rule 29.15 motion, Midgyett alleged that counsel was ineffective in: (1) failing to call Damorea Salisbury as a witness; (2) failing to call La Tonya Turner; (3) failing to call Angel Midgyett; (4) failing to call Darlene Midgyett; (5) failing to call Chrisman, the Sprint engineer; (6) failing to locate and speak to Amy Garrison; and (7) failing to sufficiently cross-examine Moody.

Midgyett argues that many small errors, which, if considered separately, may not be prejudicial enough to require reversal, may require reversal if they would serve to deprive the Rule 29.15 movant of a meaningful defense when their cumulative effect is considered. Midgyett cites only to cases from outside of Missouri to support this argument. Ultimately, we need not consider any cumulative prejudicial effect of Counsel's alleged trial error because, like the motion court, we consider all or nearly all of the alleged errors not to be errors at all, in that they were all either matters of trial strategy or were actions that did not prejudice Midgyett's defense. We will consider each in turn.

**Counsel's failure to call various witnesses:** As stated above, to establish that Counsel was ineffective for failing to call witnesses, Midgyett would have to show that each of those witnesses was: (1) known to Counsel or should have been known to Counsel; (2) able to be located through reasonable investigation; and (3) able to testify and produce viable defense for Midgyett. *Worthington*, 166 S.W.3d at 577.

**1. Damorea Salisbury:** Salisbury lived with Kelly, was present during much of the robbery on the night of Kelly's murder, and may have witnessed the murder. Salisbury knew both Cunningham and Midgyett, and originally told police that both Cunningham and Midgyett were involved. Later, however, Salisbury recanted his original statement to police, stating that he felt pressure from the police to implicate Cunningham and Midgyett for Kelly's murder. Salsibury stated that the police "had the wrong guys" in Cunningham and Midgyett. Counsel did not call Salisbury at Midgyett's first trial because he was not sure whether Salisbury's testimony would help or hurt Midgyett's case since he originally implicated Midgyett.

Furthermore, on June 1, 2007, between Midgyett's first and second trials, Salisbury was shot and badly wounded. Salisbury was still in

the hospital at the time of Midgyett's second trial. In fact, Salisbury testified that he was in the hospital for an entire year. Salisbury also testified that his memory of the events on the night of Kelly's murder had been affected by his injury. Because Salisbury was in the hospital and recuperating from serious injury (that may have adversely impacted his memory) at the time of Midgyett's second trial, Midgyett has not shown that Salisbury would have even been available to testify on Midgyett's behalf or to produce a viable defense for Midgyett. It was not error for Counsel to have not called Salisbury to testify at Midgyett's second trial.

**2. LaTonya Turner:** Turner was Midgyett's girlfriend at the time of Kelly's murder. She and Midgyett were both living with Midgyett's cousin, Natalie Midgyett, and Turner was with Midgyett and Cunningham in Natalie MIdgyett's apartment at the time of their arrest on the day following Kelly's murder. Turner testified at Midgyett's first trial. Although Midgyett argues that Turner contributed to his alibi defense, Turner never actually testified that she was with Midgyett at the time of Kelly's murder. Turner was called by the State, and was questioned about her apparent statement to police shortly after the murder that she had not see Midgyett for a couple of days prior to the murder. On cross-examination, Turner answered affirmatively that she had "seen [Midgyett] between the time that Carlos Kelly was murdered on March 29th of 2006, and when [Midgyett] was arrested on March 30th of 2006." This testimony was as close as Turner's testimony ever was to providing an alibi for Midgyett. Turner did not testify at Midgyett's evidentiary hearing on the Rule 29.15 motion; but in his motion, Midgyett claims that Turner's testimony, had she been called, would have been substantially the same as it was for his first trial. Because Turner's testimony did not provide an alibi for Midgyett at his first trial (and her testimony would have served as another connection between Midgyett and Cunningham), we conclude that Turner's testimony would not have aided him at his second trial and may have done more harm than any good. It was, therefore, not error for Counsel not to have called Turner at Midgyett's second trial.

**3. Angel Midgyett:** Angel Midgyett ("Angel") testified at Midgyett's first trial. Angel was Midgyett's cousin, and was Natalie Midgyett's ("Natalie") sister. She lived in the apartment with Natalie, Midgyett, and Turner at the time of Kelly's murder. Like Turner, Angel did not testify at Midgyett's evidentiary

hearing. Unlike Turner, Angel did testify at Midgyett's first trial that she was with Midgyett the entire time during the evening of the 28th and the morning of the 29th of March 2006, when Kelly's murder occurred. She also testified that it was not unusual for Midgyett to be awake late into the night and to be talking on his cell phone at all hours.

On the other hand, Angel did not provide an alibi to Midgyett immediately following his arrest. She had a warrant out for her arrest and did not want to talk to police for fear of being arrested. During Midgyett's first trial, the State berated Angel for her failure to come forward, asking, "So, the fact that you have a warrant and may have to answer for a charge that's against you is more important to you than clearing your cousin of a murder that he couldn't have committed because he was with you? Is that what we're hearing?" Angel answered, "I guess, if that's how you take it." Although Angel's testimony does not appear on the cold record to have been strong, it would have supported his alibi defense, assuming that she would have testified at the second trial consistently with her testimony from the first trial. Therefore, we will consider the prejudicial effect of Counsel's failure to call Angel at Midgyett's second trial after we have analyzed all of Counsel's alleged errors.

**4. Darleen Midgyett:** Darlene Midgyett ("Darlene") is Midgyett's mother. She did not testify at Movant's evidentiary hearing. Darlene testified at Midgyett's first trial that Midgyett could always be reached on his cell phone and that she spoke with Midgyett on his cell phone several times each day. Darleen testified that she spoke with Midgyett several times on March 29, 2006. None of Darlene's conversations with Midgyett, however, occurred during the late-night to early-morning hours of March 29-March 30, when Kelly was murdered. Darlene's testimony, therefore, does not put Midgyett's cell phone in his hands at the time of Kelly's murder.

Furthermore, Darlene was removed from the courtroom and cited with contempt of court early in Midgyett's second trial for calling a witness a liar in open court. After her outburst, which occurred in the jury's presence, it is likely that Darlene's testimony would not have been well received. It was thus not error for Counsel to decide not to call Darlene as a witness at Midgyett's second trial.

**5. Chrisman, Sprint Engineer:** As stated above, Counsel's failure

to call Chrisman was a matter of trial strategy and was not error.

**6. Amy Garrison:** Teisha Moody ("Moody") testified at both of Midgyett's trials that she identified Midgyett's eyes from a picture in a newspaper article that she had seen in the possession of a fellow jail inmate, Amy Garrison ("Garrison"). Midgyett argues that Counsel should have located Garrison and asked her whether Moody's story about acquiring the newspaper article from Garrison were true. At Midgyett's evidentiary hearing, he did not present any evidence as to what Garrison would have said or how Garrison's testimony would have affected his trial other than perhaps slightly further impeaching Moody's testimony. Midgyett does not allege that Garrison could have in any fashion provided information that would have provided a viable defense for him at trial. Therefore, he has not shown that Counsel erred in failing to investigate or call Garrison. *See Gennetten*, 96 S.W.3d at 153 (finding counsel ineffective for failing to investigate and call an expert witness later shown to have been able, not only to impeach another witness's testimony, *but to contradict it substantively*, which would have provided a viable defense to Gennetten).

**7. Teisha Moody:** At Midgyett's first trial, Counsel elicited from Moody that the porch light was not on when she looked out the front door and saw what she later identified as Midgyett's eyes. Counsel also elicited that, after Kelly's murder, Moody went upstairs in Kelly's apartment to retrieve drugs that the robbers did not find during the robbery before she left with Salisbury and Hawkins to call the police. Counsel did not elicit similar testimony from Moody at Midgyett's second trial. Midgyett claims that this error on Counsel's part contributed to his ineffectiveness.

Moody testified that it was dark outside when she looked through two slats in the blinds and saw a pair of eyes. She also testified that she just saw the eyes for a second and did not even have time to lock the door before the robbers burst through the door and commenced with the robbery. The fact that the porch light was not on adds little to this part of Moody's testimony.

Moody also testified that she had been doing drugs for hours on the night of Kelly's murder. She testified that she had done drugs the night before Kelly's murder, that she sold drugs with Kelly, that she did not identify herself immediately to police because she was afraid of being arrested, and that she was incarcerated at the time of Midgyett's trials on drug trafficking convictions. After Moody's

testimony, the jury already knew that Moody was a heavy drug user and a drug dealer. Testimony that she put off calling for help for her dead or dying boyfriend while she went upstairs to gather her things and the drugs that the robbers did not find would possibly further impeach Moody, but it is highly unlikely that it would make any difference in the jury's assessment of her credibility and her identification of Midgyett when considering her testimony as a whole. Moreover, as the motion court noted in its order, "[a] simple failure to impeach a witness does not warrant post-conviction relief." *Gray v. State*, 139 S.W.3d 617, 622 (Mo. App. W.D. 2004). Movant must show that had the witness been impeached, it would have provided him with a defense or changed the outcome of the trial." *Id.* In this case, the motion court found that the testimony that Counsel failed to elicit from Moody would have neither provided a viable defense nor changed the outcome of Midgyett's second trial. We agree.

**Prejudicial Effect of Error:** The only one of Counsel's alleged trial errors that is even arguably a legitimate error would be Counsel's failure to call Angel to support Midgyett's alibi defense. And, standing by itself, Counsel's failure to produce Angel, whose testimony was not strong and was mostly duplicative of her sister's testimony, was not reasonably likely to have affected the outcome of Midgyett's second criminal trial. The other alleged errors were not errors at all, but rather matters of sound trial strategy, or matters of no evidentiary consequence. "Numerous non-errors cannot add up to error." *State v. Gray*, 887 S.W.2d 369, 390 (Mo. banc 1994) (internal quotation omitted). There was simply no cumulative or aggregate effect of errors for the motion court to consider and we find the motion court's analysis to comport with the *Strickland* requirements. Accordingly, Midgyett's third point on appeal is denied.

### Conclusion

It was not clearly erroneous for the motion court to conclude that Counsel was not constitutionally ineffective in his representation of Midgyett at his second trial. Thus, the judgment of the motion court is affirmed.

(Doc. No. 8, Ex. 4, pp. 5-15).

The resolutions of grounds 4, 5, 6, 7, 8, 9, and 11 by the state court did not result in "a

decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States" or in "a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(1) and (2) (as amended April 24, 1996), as defined by the Supreme Court in Williams v. Taylor, 529 U.S. 362, 412 (2000).[2] Applying the Strickland standard of review to the facts as set forth in the record, the Court finds that counsel was not ineffective.

Grounds 4, 5, 6, 7, 8, 9, and 11 are denied.

## CERTIFICATE OF APPEALABILITY

Under 28 U.S.C. § 2253(c), the Court may issue a certificate of appealability only "where a petitioner has made a substantial showing of the denial of a constitutional right." To satisfy this standard, a petitioner must show that a "reasonable jurist" would find the district court ruling on the constitutional claim(s) "debatable or wrong." Tennard v. Dretke, 542 U.S. 274, 276 (2004). Because petitioner has not met this standard, a certificate of appealability will be denied. See 28 U.S.C. § 2254, Rule 11(a).

## ORDER

Accordingly, it is **ORDERED** that:

(1) the above-captioned petition for a writ of habeas corpus is denied;

---

[2] According to the concurrence of Justice OConnor, joined by four other members of the Court, under the contrary to clause, a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the Supreme] Court has on a set of materially indistinguishable facts. Under the unreasonable application clause, a federal habeas court may grant the writ if the state court identifies the correct legal principle from [the Supreme] Courts decisions but unreasonably applies that principle to the facts of the prisoners case. Williams, 529 U.S. at 413, 120 S.Ct. at 1523.

(2) this case is dismissed with prejudice; and

(3) the issuance of a certificate of appealability is denied.

      /s/ Gary A. Fenner            
GARY A. FENNER
UNITED STATES DISTRICT JUDGE

Kansas City, Missouri,

Dated: May 30, 2014.